# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **EMMANUEL A. CALTON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:19cv00042 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Emmanuel A. Calton, ("Calton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."

*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Calton protectively filed his applications for DIB and SSI on June 14, 2016, alleging disability as of November 8, 2016,[1] due to a herniated disc; a "pinched nerve;" severe right knee and hip pain; severe depression; anxiety; and memory loss. (R. at 16, 39, 229-36, 250.) The claims were denied initially and upon reconsideration. (R. at 127-29, 134-36, 140-44, 146-51, 153-55.) Calton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 156-57.) The ALJ held a hearing on May 11, 2018, at which Calton was represented by counsel. (R. at 34-59.)

By decision dated September 12, 2018, the ALJ denied Calton's claims. (R. at 16-28.) The ALJ found that Calton met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2017. (R. at 18.) The ALJ found that Calton had not engaged in substantial gainful activity since November 8, 2016, the alleged onset date. (R. at 18.) The ALJ determined that Calton had severe impairments, namely depression; anxiety; post-traumatic stress disorder, ("PTSD"); osteoarthritis of the hip; and lumbago with sciatica, but he found that Calton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ found that Calton had the residual functional capacity to perform sedentary[2]

_____

[1] At his hearing, Calton amended his onset date to November 8, 2016. (R. at 39.)

[2] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as

work that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; that did not require him to work around hazards and unprotected heights; and that allowed only occasional exposure to temperature extremes, wetness, humidity and vibrations. (R. at 21.) The ALJ also found that Calton could perform only simple, routine tasks in a job without strict production rate or pace requirements and with no more than occasional interaction with the public, co-workers and supervisors. (R. at 21.) The ALJ found that Calton was unable to perform his past relevant work. (R. at 26.) Based on Calton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Calton could perform, including the jobs of an addressing clerk and a small item assembler. (R. at 26-27.) Thus, the ALJ concluded that Calton was not under a disability as defined by the Act and was not eligible for SSI and DIB benefits. (R. at 27-28.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2019).

After the ALJ issued his decision, Calton pursued his administrative appeals, (R. at 221-23), but the Appeals Council denied his request for review. (R. at 1-5.) Calton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2019). This case is before this court on Calton's motion for summary judgment filed April 13, 2020, and the Commissioner's motion for summary judgment filed May 12, 2020.

---

one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2019).

## II. Facts

Calton was born in 1988, (R. at 229, 235), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Calton has a high school education and past relevant work experience a telemarketer, a lumber stacker, a warehouse worker and a pillow filler. (R. at 40-42, 55, 251.) Calton testified that he stopped working in 2013 when his physical health started to decline, and his depression worsened. (R. at 44.) Calton stated that he injured his back shortly after leaving his job. (R. at 44.) He testified that he felt frustrated, hopeless and "like a failure." (R. at 45.) Calton described having suicidal thoughts, difficulty controlling his anger and an inability to deal with people. (R. at 46-49.) He also stated that he had hip and back pain, which made it difficult to stand up and move around. (R. at 53.)

Rick Bradley, a vocational expert, was present and testified at Calton's hearing. (R. at 55-57.) Bradley was asked to consider a hypothetical individual of Calton's age, education and work history, who had the residual functional capacity to perform sedentary work that did not require more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; that did not require him to work around hazards, such as machinery and unprotected heights; that required no more than occasional exposure to temperature extremes, wetness, humidity and vibrations; and that required no more than simple, routine tasks in a job without strict production rate or pace requirements and with no more than occasional interaction with the public, co-workers and supervisors. (R. at 56.) He stated that such an individual could perform the jobs of an addressing clerk and a small item assembler. (R. at 57.) Bradley stated that there would be no jobs available should the individual have an unsatisfactory ability to relate to co-workers and supervisors; to work independently;

to maintain basic attention and concentration; and to behave in a stable manner. (R. at 57.)

In rendering his decision, the ALJ reviewed records from Lee County Public Schools; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Lewis Singer, M.D., a state agency physician; Jo McClain, Psy.D., a state agency psychologist; Dr. Roger Tims, M.D., a state agency physician; Indian Path Medical Center, ("Indian Path"); Mountain States Health Alliance, ("Mountain States"); The Health Wagon; Appalachia Family Health; Elizabeth A. Jones, M.A., a licensed senior psychological examiner; Lonesome Pine Hospital, ("Lonesome Pine"); and Melinda M. Fields, Ph.D., a licensed psychologist.

School records show delayed developmental milestones and concerns for fine and gross motor skills. (R. at 299, 302.) Calton was identified as a "hyperactive child." (R. at 300, 302.) In March 1995, the Wechsler Intelligence Scale for Children - Third Edition, ("WISC-III"), was administered, and Calton obtained a performance IQ score of 89, a verbal IQ score of 81 and a full-scale IQ score of 83. (R. at 303.) In June 1995, a school psychologist evaluated Calton, assessing borderline ADHD. (R. at 298.)

On October 10, 2014, Calton presented to the emergency department at Indian Path for complaints of hip and bilateral knee pain. (R. at 349-79.) An MRI of Calton's spine showed mild degenerative changes at the L4-L5 and L5-S1 levels; disc desiccation at the L4-L5 and L5-S1 levels with bilateral hypertrophic facet arthritic changes; central protrusion at the L4-L5 level; and left paracentral protrusion at the L5-S1 level. (R. at 355.) He was diagnosed with lumbar radiculopathy and right knee

weakness. (R. at 362.) It was noted that, upon discharge, Calton ambulated out of the emergency department in no acute distress. (R. at 378.)

On June 27, 2016, Calton established care with Tauna Gulley, F.N.P., a family nurse practitioner with The Health Wagon. (R. at 407-08.) Calton complained of right leg and back pain. (R. at 407-08.) Calton stated that he experienced pain when sitting, and he sometimes used a cane to walk. (R. at 407.) He also reported problems with depression. (R. at 407.) Upon examination, Calton had paraspinal muscle spasm; he had tenderness to palpation over the lumbar-sacral spine; he had positive straight leg raise testing, bilaterally; he had a normal gait; his speech was clear; he made good eye contact; and his thought process was logical and goal directed. (R. at 407.) Gulley diagnosed lumbago with sciatica of the right side and an adjustment disorder with mixed anxiety and depressed mood. (R. at 407.) On July 14, 2016, Calton complained of low back pain that radiated to his right hip and leg. (R. at 405-06.) Calton had paraspinal muscle spasm; he had tenderness to palpation over the lumbar-sacral spine; he had a normal gait; his speech was clear; he made good eye contact; and his thought content was without suicidal ideation or delusions. (R. at 405.) Gulley diagnosed lumbago with sciatica of the right side. (R. at 405.)

The record shows that Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, treated Calton for his complaints of depression from July 2016 through May 2018. During this time, Burke diagnosed PTSD; other depressive episodes; major depressive disorder, single episode, severe, without psychotic features; and unspecified anxiety disorder. (R. at 410, 438, 449, 468, 476, 586, 601, 605, 628, 706.) On July 19, 2016, Calton reported that he had been depressed since he was eight years old. (R. at 410.) He stated that he was repeatedly "beaten and abused" by his stepfather and that "my mother did nothing." (R. at 410.) Calton reported that he then went to live with his biological father and his

father's boyfriend, and that his father sexually assaulted and "raped me." (R. at 410.) Calton stated that his father then sent him to live with his grandparents. (R. at 410.) Calton reported that he was unable to work due to a back injury. (R. at 410.) Burke described Calton's appearance and grooming as disheveled; he had a depressed mood and dysphoric affect; he made minimal eye contact; his thought process was slowed and impoverished; and his judgment and insight were fair. (R. at 411.) Subsequent visits show that Calton described his depression as mildly improved and mild. (R. at 577, 585.) He reported that his medication helped his symptoms of depression, but he continued to occasionally have some depression, anxiety and PTSD symptoms. (R. at 443, 446, 467, 475, 603, 611, 619, 626.) Calton also enjoyed visiting with his mother, sister and nephew, (R. at 577), and he dealt with a stressful situation following the death of his roommate's father. (R. at 594, 626.) Calton continued playing video games and met new friends online with whom he enjoyed chatting. (R. at 471, 585, 599, 611, 626, 704.) He also reported reading, carving wood, going to movies and starting a journal. (R. at 585, 611.)

The record shows that, from August 2016 through May 2018, Rebecca Mullins, F.N.P., a family nurse practitioner with Appalachian Family Health, treated Calton for his complaints of back, knee and hip pain and lumbar radiculopathy. During this time, Calton's gait was normal; he had tenderness in the lumbar spine; he had normal lumbar lordosis; his lumbar spine range of motion was normal; his lumbar spine was stable; he had appropriate judgment; and good insight. (R. at 465, 500, 504, 507, 512, 515, 559, 567, 582, 590, 596, 617, 621, 634.) Mullins diagnosed nicotine dependence; lumbar radiculopathy; generalized osteoarthritis; cervical disc displacement, unspecified cervical region; unilateral primary osteoarthritis of the hip; bilateral knee pain; fatigue; mixed hyperlipidemia; major depressive disorder, single episode,

moderate; anxiety disorder; right hip pain; low back pain; and hypertension. (R. at 466, 500-01, 504-05, 508, 513, 516, 559, 567, 575, 583, 591, 596, 617, 622, 634.)

On September 2, 2016, Willie Hamilton, F.N.P., a family nurse practitioner with The Health Wagon, saw Calton who reported that he was "feeling better on Paxil." (R. at 416.)

On November 8, 2016, Elizabeth A. Jones, M.A., a licensed senior psychological examiner, evaluated Calton at the request of Disability Determination Services. (R. at 423-27.) Calton reported that his medication helped, but he lacked motivation and felt "blah." (R. at 424-25.) Calton reported that he graduated high school with a modified standard diploma. (R. at 424.) He stated that he was in special education classes because "I would get bored and wouldn't do the work." (R. at 424.) He reported no difficulty reading or writing and stated, "I know I'm pretty intelligent." (R. at 424.) Jones reported that Calton appeared to be of average intelligence. (R. at 424.) When asked about hobbies or interests, Calton stated that he played video games a lot and enjoyed reading. (R. at 424.) Calton attributed his disability to chronic back pain. (R. at 427.) Jones reported that Calton had no memory deficits; his affect was mildly blunted, although he did smile and laugh on occasion; he had moderate eye contact; he had no difficulty with attention and concentration; he exhibited no evidence of any disordered thought processes; his stream of conversation was appropriate; and he was rational and alert. (R. at 425.)

Jones opined that Calton did not have limitations in his ability to understand and remember simple and detailed instructions; he had mild limitations in his ability to sustain concentration and persistence, which may cause some difficulty maintaining schedules and attendance; he had moderate limitations with social

interaction, which may cause some difficulty interacting with others; and he had mild limitations in adaptation, as he did not travel unaccompanied. (R. at 426.) Jones diagnosed persistent depressive disorder with anxious distress and other specified personality disorder with avoidant and dependent features. (R. at 427.)

On November 15, 2016, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Calton suffered from a severe affective disorder and anxiety disorder. (R. at 65-66.) He found that Calton had mild restrictions on his activities of daily living; he had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 65.) Dr. Bockner found that Calton's symptoms would limit his ability to perform detailed work, and he would need an environment with "low social demands." (R. at 66.)

That same day, Dr. Bockner completed a mental assessment, indicating that Calton had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 69-70.) Dr. Bockner stated that Calton's work-related mental abilities were, otherwise, not significantly limited. (R. at 69-70.)

On November 15, 2016, Dr. Lewis Singer, M.D., a state agency physician, opined that Calton had the residual functional capacity to lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; he could stand and/or walk, with normal breaks, a total of four hours in an eight-hour workday; he could sit, with normal breaks, a total of six hours in an eight-hour workday; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could frequently balance; and he could never climb ladders, ropes or scaffolds. (R. at 67-68.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 68.)

On December 7, 2016, Burke completed a mental assessment, indicating that Calton had a satisfactory ability to follow work rules; to relate to co-workers; to use judgment in public; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out simple and detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 434-36.) She found that Calton had a seriously limited ability to deal with the public; to deal with work stresses; and to understand, remember and carry out complex job instructions. (R. at 434-35.) Burke found that he could manage his own benefits and that he would be absent from work more than two days a month. (R. at 436.)

On December 14, 2016, Calton reported that the medication was helping, but he continued to have some depression, anxiety and PTSD. (R. at 475.) He reported agitation and anger at times and stated the he "put holes in his walls." (R. at 475.) Calton reported increased stress due to a conflict with a close friend. (R. at 475.) Burke described Calton's appearance and grooming as casual; he had a depressed mood and

congruent affect; he made adequate eye contact; his thought process was intact; and his judgment and insight were fair. (R. at 476.)

On December 20, 2016, Mullins completed a medical assessment, indicating that Calton had the residual functional capacity to lift and carry items weighing five pounds occasionally and two pounds frequently; he could stand and/or walk a total of two hours in an eight-hour workday, and he could do so for up to one hour without interruption; he could sit up to four hours in an eight-hour workday, and he could do so for up to two hours without interruption; he could never climb, stoop, kneel, balance, crouch or crawl; he had limited ability to reach, handle, feel, push, pull, see, hear and speak; and he was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 431-33.) She based her findings on Calton's diagnosis of degenerative disc disease of the lumbar spine. (R. at 431-33.) Mullins opined that Calton would be absent from work more than two days a month. (R. at 433.)

On February 13, 2017, Calton complained of low back, right hip and bilateral knee pain. (R. at 573.) Mullins reported that Calton's gait was normal; he had tenderness in the lumbar spine; he had normal lumbar lordosis; his lumbar spine range of motion was normal; his lumbar spine was stable; and his right upper extremity had normal range of motion and joint stability. (R. at 575.) X-rays of Calton's lumbosacral spine showed mild scoliosis and mild degenerative disc disease at the L5-S1 level. (R. at 644.) X-rays of Calton's right hip and knees showed significant osteoarthritis of the hip joint; suspicion of avascular necrosis of the femoral head; and no significant abnormalities of the knee joints were noted. (R. at 644.)

On March 24, 2017, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF, indicating that Calton suffered from a severe affective disorder and anxiety disorder. (R. at 95-96.) She found that Calton had moderate limitations in his ability to understand, remember and apply information, to interact with others and to concentrate, persist or maintain pace. (R. at 96.) McClain found that Calton had no limitations on his ability to adapt or manage himself. (R. at 96.) She found that Calton's symptoms would limit his ability to perform detailed work, and he would need an environment with "low social demands." (R. at 96.)

That same day, McClain completed a mental assessment, indicating that Calton had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 100-01.) McClain stated that Calton's work-related mental abilities were, otherwise, not significantly limited. (R. at 100-01.)

On March 27, 2017, Dr. Roger Tims, M.D., a state agency physician, opined that Calton had the residual functional capacity to lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; he could stand and/or walk, with normal breaks, a total of four hours in an eight-hour workday; he could sit, with normal breaks, a total of six hours in an eight-hour workday; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could frequently balance; and he could never climb ladders, ropes or scaffolds. (R. at 98-100.) No manipulative,

visual or communicative limitations were noted. (R. at 99.) Dr. Tims found that Calton should avoid concentrated exposure to extreme heat, wetness, humidity, vibration and hazards, such as machinery and heights. (R. at 99.) He opined that Calton's medical problems were directly related to obesity. (R. at 99.)

On July 17, 2017, Calton reported problems with pain issues, as well as depression and problems coping with stress. (R. at 607.) Burke described Calton's appearance and grooming as casual; he had a mildly depressed mood and congruent affect; he made appropriate eye contact; his thought process was intact; and his judgment and insight were fair. (R. at 609.) On August 16, 2017, Calton reported that his moods were stable and that his medications were helping. (R. at 611.) He stated that he enjoyed playing games and chatting with friends. (R. at 611.) Burke described Calton's appearance and grooming as casual; he had a mildly depressed mood and improved affect; he made appropriate eye contact; his thought process was intact; and his judgment and insight were good. (R. at 613.) That same day, Calton saw Mullins for complaints of worsening right hip pain. (R. at 615.) Mullins reported that Calton was in no acute distress, and his gait was normal. (R. at 617.)

On September 28, 2017, Calton reported that he had been gaming and chatting with friends online. (R. at 704.) He reported a difficult time coping with spinal pain and stated that he could not work due to spinal pain and an inability to deal with people. (R. at 704.) Burke described Calton's appearance and grooming as casual; he had a mildly depressed mood and congruent affect; he made appropriate eye contact; his thought process was intact; and his judgment and insight were fair. (R. at 706.) On October 26, 2017, Calton reported multiple joint pain. (R. at 619.) Dr. Esther Ajjarapu, M.D., a physician with Appalachia Family Health, reported that Calton's gait was normal; his motor examination revealed normal tone, bulk and strength; he

had appropriate judgment and good insight; his recent and remote memory were intact; and his mood was euthymic with an appropriate affect. (R. at 621.)

On January 31, 2018, Calton complained of back, knee and hip pain, which worsened in cold weather. (R. at 631.) Calton's gait was normal; he had appropriate judgment and good insight; and his mood was euthymic with an appropriate affect. (R. at 634.) On March 26, 2018, Calton reported problems with fatigue, depression and back and knee problems. (R. at 713.) Burke described Calton's appearance and grooming as clean, neat and casual; he had a depressed mood and dysphoric affect; he made adequate eye contact; his thought process was intact; and his judgment and insight were fair. (R. at 716.)

On April 5, 2018, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Calton to determine his current adjustment pattern and assist with diagnostic determination. (R. at 718-24.) Fields reported that Calton was pleasant and cooperative; he had minimal eye contact; he provided responses to direct inquiries in a relevant and coherent fashion; his mood was anxious as well as depressed; his affect was restricted; his stream of thought was organized and logical, and there was no evidence of thought content impairment; his judgment was adequate; his immediate memory was within normal limits; his recent recall was impaired, as evidenced by his ability to recite two of four words after a delay; his concentration was impaired, as evidenced by serial three performance; and his pace and gait appeared slow. (R. at 722.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Calton obtained a full-scale IQ score of 92. (R. at 722-23.) Fields diagnosed PTSD; major depressive disorder, recurrent; and avoidant and dependent personality disorder traits. (R. at 724.)

Fields also completed a mental assessment, indicating that Calton had a slight limitation in his ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 725-27.) She opined that Calton had a satisfactory ability to use judgment in public; to interact with supervisors; to understand, remember and carry out detailed job instructions; and to demonstrate reliability. (R. at 725-26.) Fields opined that Calton had a seriously limited ability to relate to co-workers; to deal with the public; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 725-26.) Fields opined that Calton could manage his own benefits and that he would be absent from work more than two days a month. (R. at 727.)

On April 27, 2018, Burke completed a mental assessment, indicating that Calton had a slight limitation in his ability to understand, remember and carry out simple job instructions. (R. at 728-30.) She opined that Calton had a satisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 728-29.) Burke opined that Calton had a seriously limited ability to deal with work stresses; to maintain personal appearance; and to demonstrate reliability. (R. at 728-29.) Burke opined that Calton could manage his own benefits and that he would be absent from work more than two days a month. (R. at 730.)

On May 2, 2018, Calton reported that he stayed up most of the night and slept most of the day. (R. at 737.) He reported most of his interest and motivation remained low, stating that he mostly played video games and utilized YouTube. (R. at 737.) Burke described Calton's appearance and grooming as clean, neat and well-groomed; he had a mildly depressed mood and congruent affect; he made appropriate eye contact; his thought process was intact; and his judgment and insight were good. (R. at 740.) That same day, Calton complained of increased back and joint pain. (R. at 731.) Calton had a normal gait; his judgment was appropriate with good insight; and his mood was euthymic with an appropriate affect. (R. at 734.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Calton argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Particularly, Calton argues that the ALJ erred by failing to give controlling weight to the opinions of his treating medical care providers, Mullins and Burke, and to the opinion of psychologist Fields. (Plaintiff's Brief at 6.) He argues that the ALJ erred by giving controlling weight to the opinions of the state agency physicians, which he contends were "stale [and] outdated." (Plaintiff's Brief at 6.)

Calton argues that the ALJ erred by failing to accord controlling weight to the opinions of Mullins, Burke and Fields, thereby improperly determining his residual functional capacity. (Plaintiff's Brief at 4-6.) The ALJ found that Calton had the residual functional capacity to perform sedentary work that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; that did not require him to work around hazards and unprotected heights; and that allowed only occasional exposure to temperature extremes, wetness, humidity and vibrations. (R. at 21.) The ALJ also found that Calton could perform only simple, routine tasks in a job without strict production rate or pace requirements and with no more than occasional interaction with the public, co-workers and supervisors. (R. at 21.)

In making this residual functional capacity finding, the ALJ stated that he was giving "little weight" to Burke's opinions because Burke is not an acceptable source, and, even if she were, her opinions were inconsistent with objective records and treatment provided. (R. at 25, 434-36, 728-30.) The ALJ recognized that Burke, a licensed clinical social worker, is not an acceptable medical source under the regulations. (R. at 25.) As a licensed clinical social worker, Burke is not considered an acceptable medical source as defined by the Act. *See* 20 C.F.R. §§ 404.1502(a), 416.902(a) (2019) (defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and – for limited purposes – licensed optometrists, licensed podiatrists, qualified speech-language pathologists, licensed audiologists, licensed advanced practice nurses and licensed physician assistants). Evidence from such nonacceptable medical sources cannot be used to establish the existence of a medically determinable impairment, but they may "provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." *Ingle v. Astrue*, 2011 WL 5328036, at *3 (W.D. N.C. Nov. 7, 2011) (citing Social Security Ruling, ("S.S.R."), 06-03p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings, 2006 WL 2263437 (Aug. 9, 2006); 20 C.F.R. §§ 404.1527(a), 416.927(a) (2019)). To determine the weight to be given to the opinion of a nonacceptable medical source, the ALJ must consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. *See Beck v. Astrue*, 2012 WL 3926018, at *12 (S.D. W. Va. Sept. 7, 2012) (citing S.S.R. 06-03p).

The ALJ noted that Burke's opinions showed no acute mental pathology or symptomology, and she advised continued conservative treatment and counseling. (R. at 23.) Burke's treatment records show that both Burke and Calton described his depression as mild. (R. at 578, 585.) Calton made good eye contact; his thought process was logical and goal directed; his speech was clear; and he had appropriate judgment and good insight. (R. at 405, 407, 465, 512, 515, 590, 613, 621, 634, 734, 740.) He reported that his medication helped his symptoms of depression. (R. at 416, 424-25, 443, 446, 467, 475, 603, 611, 619, 626.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Calton stated that he enjoyed visiting with his mother, sister and nephew. (R. at 577.) He continued playing video games and met new friends online with whom he enjoyed chatting. (R. at 424, 471, 585, 599, 611, 626, 704, 737.) He also reported reading, carving wood, going to movies and starting a journal. (R. at 424, 585, 611.) Because Burke was not an acceptable medical source, and her opinions were inconsistent with the evidence as a whole, the ALJ reasonably gave them little weight. (R. at 25.) *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (stating that if an opinion is "inconsistent with other substantial evidence, it should be accorded significantly less weight").

The ALJ stated that he was giving "little weight" to psychologist Fields's opinion that the symptoms associated with PTSD and major depressive disorder, recurrent with avoidant and dependent personality traits, would cause prominent functional restrictions on Calton's overall capacity to make occupational, performance and personal/social adjustments, and he would miss more than two days of work per month due to his impairments, as it was inconsistent with the overall record evidence. (R. at 25, 725-27.)  Fields reported that Calton displayed no evidence of thought content impairment; his judgment was adequate; his immediate memory

was within normal limits; his recent recall was impaired, as evidenced by his ability to recite two of four words after a delay; his concentration was impaired, as evidenced by performance of Serial 3s; and his stream of thought was organized and logical. (R. at 722.) As noted above, Calton described his depression as mild, (R. at 585); he made good eye contact; his thought process was logical and goal directed; his speech was clear; and he had appropriate judgment and good insight; (R. at 405, 407, 465, 512, 515, 590, 613, 621, 634, 734, 740); he reported that his medication helped his symptoms of depression. (R. at 416, 424-25, 443, 446, 467, 475, 603, 611, 619, 626); he routinely played video games and met new friends online with whom he enjoyed chatting, (R. at 424, 471, 585, 599, 611, 626, 704, 737); and he also reported reading, carving wood, going to movies and starting a journal. (R. at 424, 585, 611.)

The ALJ gave "great weight" to the state agency psychologists' opinions because they were consistent with the record as a whole. (R. at 24-25, 65-70, 95-101.) The ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (2019). While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. §§ 404.1527, 416.927(c) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig*, 76 F.3d at 590. Both state agency psychologists opined that Calton's symptoms would limit his ability to perform detailed work, and he would require an environment with "low social demands." (R. at 66, 96.)

In addition, the ALJ gave weight to psychologist Jones's opinion because it was supported by the objective examination and other objective treatment notes of record. (R. at 25, 423-27.) Calton reported that he attributed his disability to chronic back pain. (R. at 427.) He reported that his medication helped, but he lacked motivation and felt "blah." (R. at 424-25.) Calton reported playing video games a lot and that he enjoyed reading. (R. at 424.) He had no memory deficits; he had no difficulty with attention and concentration; he exhibited no evidence of any disordered thought processes; his stream of conversation was appropriate; and he was rational and alert. (R. at 425.) Jones opined that Calton had moderate limitations with social interaction. (R. at 426.) Therefore, based on his reliance of the state agency psychologists' and Jones's opinions, the ALJ limited Calton to simple, routine tasks in a job without strict production rate or pace requirements and with no more than occasional interaction with the public, co-workers and supervisors. (R. at 21.)

The ALJ gave "great weight" to the state agency physicians' assessments, who opined that Calton could perform a limited range of light[3] work. (R. at 24-25, 67-68, 98-100.) The ALJ noted that the state agency physicians' assessments were supported by the objective evidence of record. (R. at 25.) Calton's examinations routinely showed that he had a normal gait; he had normal lumbar lordosis; his lumbar range of motion was normal; and his lumbar spine was stable. (R. at 465, 500, 504, 507, 512, 515, 559, 567, 575, 582, 590, 596, 617, 621, 634, 734.) In February 2017, x-rays of Calton's lumbosacral spine showed mild scoliosis and mild degenerative disc disease at the L5-S1 level. (R. at 644.) X-rays of Calton's right hip showed significant osteoarthritis of the hip joint and suspicion of avascular necrosis of the femoral head.

---

3 Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2019).

(R. at 644.) Yet, in October 2017, Dr. Ajjarapu reported that Calton's gait was normal, and a motor examination revealed normal tone, bulk and strength. (R. at 621.) Furthermore, treatment records show that Calton reported that his pain was controlled with medication. (R. at 440, 443, 499.) *See Gross,* 785 F.2d at 1166.

Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. §§ 404.1513a(3)(b)(1), 416.913a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings, 1996 WL 374180 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Calton argues that the ALJ should have given the state agency physicians' assessments less weight because they were "stale [and] outdated." (Plaintiff's Brief at 6.) The simple fact that expert opinions came later in time does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A]

lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency medical opinions were consistent with the record as a whole. Given Calton's subjective complaints, the ALJ limited Calton to a limited range of sedentary work. (R. at 21, 26.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Calton had the residual functional capacity to perform a limited range of sedentary work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;

2.    Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence; and

3.    Substantial evidence exists in the record to support the Commissioner's finding that Calton was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Calton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    October 13, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE